AMERICAN BROADCASTING
COMPANIES, INC.,
Appellant,

v.

Christopher GILL, Laura Gill,
Richardson Gill, and Peter
Gill, Appellees.

No. 04–97–00838–CV.

Court of Appeals of Texas,
San Antonio.

June 16, 1999.

Rehearing Overruled Aug. 11, 1999
and Oct. 12, 1999.

Charles L. Babcock, Frank C. Vecella, Alan N. Greenspan, Jackson Walker, L.L.P., Dallas, James L. Walker, Gary D. Glick, Jackson Walker, L.L.P., San Antonio, for Appellant.

James L. Branton, Carol P. Lomax, Branton & Hall, P.C., San Antonio, Oliver S. Heard, Jr., Heard Linebarger Graham Goggan Blair Pena & Sampson, San Antonio, Jack Paul Leon, Leon, Amerson & Carroll, L.L.P., San Antonio, for Appellees.

Sitting: TOM RICKHOFF, Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice.

## OPINION

Opinion by: SARAH B. DUNCAN, Justice.

ABC appeals the denial of a summary judgment on the Gills' defamation and non-defamation claims arising out of the news gathering process for, and the broadcast of, a *Day One* news program. We hold this court is statutorily authorized to exercise jurisdiction over all of the Gills' claims, including the non-defamation claims ABC does not defend on free speech grounds, and ABC is entitled to judgment as a matter of law. We therefore reverse the trial court's order in its entirety and render judgment in ABC's favor.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 2, 1995, ABC aired a *Day One* news program that investigated why the Resolution Trust Corporation had recovered only a small part of the cost of the savings and loan bailout from the officers, directors, and other insiders at failed S & Ls, particularly in Texas and at Gill Savings Association in San Antonio. Three months after the program aired, ABC was sued by the Gills—Christopher Gill, his wife Laura, and his brothers Richardson and Peter. Initially, the Gills alleged ABC defamed them, invaded their privacy, and trespassed on their property in preparing for and airing the broadcast. The Gills later added additional defamation claims, as well as claims for tortious interference with contractual and fiduciary relationships, and abuse of process arising out of the news gathering process. ABC moved for summary judgment on all of the Gills' claims under subsections (c) and (i) of Rule 166a, Tex.R. Civ. P., but the trial court denied ABC's motion in its entirety.

## II. JURISDICTION

■ As a preliminary matter, we must determine the scope of our jurisdiction.

■ As a general rule, an interlocutory order denying a motion for summary judgment is not appealable. *E.g., Humphreys v. Caldwell,* 888 S.W.2d 469, 470 (Tex. 1994). However, an interlocutory appeal is permitted in certain cases involving the constitutional right to free speech:

> (a) A person may appeal from an interlocutory order of a district court, county court at law, or county court that:
>
> . . . .
>
> (6) denies a motion for summary judgment that is based in whole or in part upon a claim or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73 . . . .

TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(6) (Vernon Supp.1998).

ABC, in its capacity as a member of the electronic media, filed a summary judgment motion based in part upon defenses arising under the free speech clauses of the United States and Texas Constitutions and the law of libel contained in chapter 73. Therefore, under the plain language of section 51.014(a)(6), the entirety of the trial court's order denying ABC's motion is appealable. *See Delta Air Lines, Inc. v. Norris,* 949 S.W.2d 422, 428–29 (Tex. App.—Waco 1997, writ denied). *But see*

*KTRK Television, Inc. v. Fowkes*, 981 S.W.2d 779, 787 (Tex.App.—Houston [1st Dist.] 1998, pet. denied) (stating in dicta that section 51.014(a)(6) confers jurisdiction to consider only those claims that are "defended in whole or in part on free speech grounds").

### III. SUMMARY JUDGMENT EVIDENCE

■ The Gills argue we may not consider as summary judgment evidence certain documents received from and statements attributed to certain employees and former employees of the FDIC because this evidence was excluded by a June 12, 1997 court order.[1] We disagree.

The June 12 order was not self-executing or unconditional. Rather, it excluded evidence only if the Gills provided the FDIC with a copy of the order and the information the FDIC requested, and the FDIC thereafter refused to permit depositions. The conditional nature of the order was in fact implicitly recognized by the Gills when they filed objections to evidence that might have been encompassed by the June 12 order. But the Gills failed to obtain rulings on these objections, and the correspondence attached to their objections establishes the Gills failed to meet the condition imposed by the June 12 order. We will therefore consider all of ABC's summary judgment evidence.

### IV. STANDARD OF REVIEW

■ Whether an order grants or denies a motion for summary judgment, we apply the same de novo standard of review on appeal. *See Valores Corporativos, S.A. de C.V. v. McLane Co.*, 945 S.W.2d 160, 162 (Tex.App.—San Antonio 1997, writ denied); *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 247 (Tex.App.—San Antonio 1996, no writ). We will thus reverse an order denying a traditional motion for summary judgment under Rule 166a(c) and render judgment in the movant's favor only if the summary judgment evidence establishes there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law on a ground set forth in the motion. *See* TEX.R. CIV. P. 166a(c). We will reverse an order denying a "no evidence" motion for summary judgment under Rule 166a(i) and render judgment in the movant's favor only if the respondent fails to produce summary judgment evidence raising a genuine issue of material fact on each challenged element. *See* TEX.R. CIV. P. 166a(i). In deciding whether the summary judgment evidence raises a genuine issue of material fact, we view as true all evidence favorable to the respondent and indulge every reasonable inference and resolve all doubts in its favor. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

### V. TRESPASS

■ Christopher and Laura Gill allege ABC film crew members entered and filmed two of their properties, the Spanish Main Apartments and the Greenspoint office building, without their permission. However, there is no trespass without an

---

1. The June 12, 1997 order provided in pertinent part:

It is ORDERED that, unless within ten (10) days from the date of this order, the FDIC either responds that the deposition of a witness listed on Exhibit A hereto shall be permitted to be taken in accordance with Rule 200 of the Texas Rules of Civil Procedure and the Court decisions thereunder and that the witness may be interrogated to the full extent permitted by Rule 166b(2) of the Texas Rules of Civil Procedure, or responds that the FDIC does not object to a deposition of that witness, then that witness' testimony, or any document received from that witness shall be and is hereby excluded from the summary judgment evidence, and shall not be quoted or cited by any other witness as a basis for any summary judgment proof.

It is ORDERED that [the Gills] shall provide to the FDIC within three (3) days of the date of this Order, all information previously requested by the FDIC, and a copy of this Order, so that the FDIC can make a timely decision in accordance with this Order.

entry upon land, *Railroad Comm'n v. Manziel,* 361 S.W.2d 560, 567 (Tex.1962), and there is no summary judgment evidence of an entry upon either property by any ABC employee.[2] We therefore reverse the trial court's denial of ABC's motion for summary judgment on the Gills' trespass claim and render judgment in ABC's favor.

## VI. Invasion of Privacy

■ Christopher and Laura Gill also allege ABC's filming of the Spanish Main Apartments and the Greenspoint office building invaded their privacy. However, because the *Day One* broadcast "provided the public with nothing more than could have been seen from a public street," it cannot constitute an invasion of privacy. *Wehling v. CBS,* 721 F.2d 506, 509 (5th Cir.1983). We therefore reverse the trial court's denial of ABC's motion for summary judgment on the Gills' invasion of privacy claim and render judgment in ABC's favor.

## VII. Abuse of Process

■ The Gills allege ABC committed an abuse of process by illegally obtaining information about them, falsely portraying the RTC's investigation as inadequate, and using this illegally gained information and false portrayal to pressure the federal government into reopening the case against them. However, there is no summary judgment evidence ABC wrongfully obtained and used a writ of process in a suit. *See Tandy Corp. v. McGregor,* 527 S.W.2d 246, 249 (Tex.Civ.App.—Texarkana 1975, writ ref'd n.r.e.); *Blackstock v. Tatum,* 396 S.W.2d 463, 467–68 (Tex.Civ.App.—Houston 1965, no writ). We therefore reverse the trial court's order denying ABC's motion for summary judgment on the Gills'

abuse of process claim and render judgment in ABC's favor.

## VIII. Tortious Interference

■ The Gills allege ABC tortiously interfered with their contractual and fiduciary relationships with four former Gill Savings agents or employees by secretly and maliciously obtaining from them private, personal, and confidential information. However, the Gills failed to present any evidence of the necessary precursor of their tortious interference claim—the existence of a contractual or other relationship requiring confidentiality between the former agents or employees and the Gills at the time of their interviews with ABC. *See ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997). Indeed, there is no summary judgment evidence suggesting ABC even interviewed one of the former employees or agents, Bob Sherwood. Nor is there any evidence two of the former employees or agents, Paul Tillman and Randy German, owed the Gills any contractual or fiduciary duties; at most, there is evidence these two men may have owed duties to Gill Savings. Finally, while there is evidence Cathy Buxie may have performed some personal accounting work for the Gills while she was an employee of Gill Savings, there is no evidence she was subject to either a contractual or professional confidentiality requirement. We therefore reverse the trial court's order denying ABC's motion for summary judgment on the Gills' tortious interference claim and render judgment in ABC's favor.

## IX. Defamation

We now arrive at the Gills' primary claims: ABC defamed them in the statement promoting the March 2, 1995 *Day One* broadcast and thirty-eight statements in the broadcast (Appendix 1), in the

---

2. The Gills submitted evidence establishing a KSAT Channel 12 vehicle and film crew came onto the Spanish Main Apartments property. But they failed to submit any summary judgment evidence suggesting a connection between this vehicle and film crew and ABC. Similarly, although the Gills submitted deposition testimony from four members of ABC's film crew, none of this testimony suggests any ABC film crew member entered private property to film.

broadcast as a whole (Appendix 1), and in questions posed and statements made by ABC staff members during the news gathering process (Appendix 2). ABC contends it is entitled to summary judgment on these claims because it either conclusively negated at least one essential element of each claim or the Gills failed to produce some evidence on each challenged element. In discussing these claims, we quote the allegedly defamatory statements in context and underline the specific complained-of statements.

### A. BROADCAST DEFAMATION

1. *The Promotional and Introductory Statements*

(Promotional Statement1 and Broadcast Statements 2–6)

 In Promotional Statement 1 and Broadcast Statements 1–6, ABC promoted and introduced its story on the RTC:

> *While Washington talks about cutting school lunches, big shots are living high . . . after losing tens of billions of your tax money. What's worse, we can't get it back. If this doesn't make you mad, you're not paying attention.*[1]

> . . . .

> FORREST SAWYER, ABC News: [voice-over] *A story that will make you see red-about big shots living high after losing billions of your tax dollars.*[2]

> ART LEISER: *You talk about, "Well, the government's going to lose $500 billion." That's us! That's you and me.*[3]

> BILL DePUGH: *As a taxpayer. I figure I got screwed. Again.*[4]

FORREST SAWYER: *Robert Krulwich uncovers a shocking new twist in the biggest financial scandal in U.S. history.*[5]

. . . .

[Commercial Break]

Savings and Loan Questions

ANNOUNCER: From T.V.–1 in New York, Day One continues.

DIANE SAWYER: Remember when we were all up in arms in this country about *the savings and loan scandal, its combination of wild lending, greed, and in some cases, I guess, bad luck?*[6]

ABC contends these statements are not assertions of fact and therefore not actionable as a matter of law. We agree.

 To be actionable, a statement must constitute or contain an assertion of an "objectifiably verifiable" fact. *Burch v. Coca–Cola Co.*, 119 F.3d 305, 325 (5th Cir. 1997), *cert. denied*, — U.S. ——, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998) (citing, *e.g., Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex.App.—San Antonio 1988, writ denied), *cert. denied*, 493 U.S. 1021, 110 S.Ct. 722, 107 L.Ed.2d 742 (1990)). Because rhetorical hyperbole is not subject to objective verification, *see id.*, it is not provable as false and therefore not actionable in a case against a media defendant. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). Statements of opinion are likewise not actionable under Texas law. *Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex.1989).[3]

3. The Gills question whether *Carr* survives *Milkovich*. However, this aspect of *Carr* rests not only upon the First Amendment to the United States Constitution, the subject of the Supreme Court's opinion in *Milkovich*, but also upon the guarantee of free speech contained in article I, section 8 of the Texas Constitution. *Carr*, 776 S.W.2d at 570. Therefore, this aspect of *Carr* does not depend upon the scope of protection afforded statements of opinion by the First Amendment.

Accordingly, a majority of the Texas Courts of Appeals have continued to follow this aspect of *Carr* and afford absolute constitutional protection to expressions of opinion. *See, e.g., Brewer v. Capital Cities/ABC, Inc.*, 986 S.W.2d 636, 643 (Tex.App.—Fort Worth 1998, no pet.); *Falk & Mayfield, L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex.App.—Houston [14th Dist.] 1998, pet. denied); *Delta Air Lines, Inc. v. Norris*, 949 S.W.2d 422, 426 (Tex.App.—Waco 1997, writ denied); *Schauer v. Memori-*

Whether a statement is rhetorical hyperbole, opinion, or an actionable assertion of fact is a question of law for the court. *Carr*, 776 S.W.2d at 570.

"Rhetorical hyperbole" is "extravagant exaggeration" "employed for rhetorical effect." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 592, 1011 (1988 ed.). This is precisely the purpose and effect of Promotional Statement 1 and Broadcast Statements 2–3 and 5–6. Promotional Statement 1 provokes viewer interest by linking "cutting school lunches" with "big shots living high ... after losing tens of billions of your tax money," while Broadcast Statements 2–3 and 5–6 use similar exaggeration and the provocative personal ("you and me") to entice viewers into "staying tuned."

Just as clearly, Broadcast Statement 4 is no more than a statement of opinion by Mr. DePugh, the head of the RTC's investigatory efforts in Texas. Mr. DePugh did not assert he "got screwed" "[a]gain" "[a]s a taxpayer" as a matter of verifiable fact. He said he "figured" he did, and this statement of his belief is not subject to proof. It just is. We therefore hold Promotional Statement 1 and Broadcast Statements 2–6 are not actionable as a matter of law and reverse the trial court's order and render judgment in ABC's favor on the Gills' defamation claims arising out of these statements.

**2. *The RTC and Texas S & L Losses***

(Broadcast Statements 7–9)

■ In Broadcast Statements 7–9, ABC explained the function of the RTC and its performance of that function—the central inquiry of the segment:

> FORREST SAWYER: What a scandal it was. At the end of the day, it could cost us $500 billion. You know, the government told us they were going to set up the Resolution Trust Corporation, the RTC, to collect at least some of that money and *go after the bad guys.*[7]

> DIANE SAWYER: And it's now been six years. The term of the RTC is about to run out. And a good time, I think, to go back and look and see what it accomplished.

> FORREST SAWYER: Exactly what we've done. *We went to Texas, the state where American taxpayers lost at least $25 billion.*[8] *Now, so far in Texas, the RTC has recovered only about one tenth of one percent from the people who ran those institutions and were responsible for all those bad loans.*[9]

ABC contends these statements are true or substantially true. We agree.

■ In defamation suits against media defendants, the "'plaintiff must bear the burden of showing that the speech at issue is false....'" *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990) (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)). Falsity presents a question of law "[i]f the underlying facts as to the gist of the defamatory charge are undisputed." *See id.* at 16. A statement is substantially true if it is no more damaging than a true statement would have been. *Id.*

---

al Care Sys., 856 S.W.2d 437, 447 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Howell v. Hecht*, 821 S.W.2d 627, 631 (Tex.App.—Dallas 1991, writ denied); *accord Baldwin v. University of Texas Medical Branch at Galveston*, 945 F.Supp. 1022, 1035 (S.D.Tex.1996), aff'd, 122 F.3d 1066 (5th Cir.1997) (table); *but see Marshall v. Mahaffey*, 974 S.W.2d 942, 950 (Tex.App.—Beaumont 1998, pet. denied); *Falk & Mayfield*, 974 S.W.2d at 828, 830–32 (Fowler, J., dissenting); *Shearson Lehman Hutton, Inc. v. Tucker*, 806 S.W.2d 914, 920

(Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.). We also follow this aspect of *Carr*. As discussed in the text, a statement is not actionable under the First Amendment in a case against a media defendant unless it is provable as false, *Milkovich*, 497 U.S. at 19–20, 110 S.Ct. 2695, and a statement of "pure opinion" is not provable as false. *See Yiamouyiannis*, 764 S.W.2d at 341 ("pure opinion" and "vintage hyperbole" "are not capable of proof one way or the other").

In Broadcast Statements 7–9, *Day One*'s anchors introduced the story with statements regarding the scope and effect of S & L losses and the effect of these losses on taxpayers. The truth or substantial truth of these statements is established not only by the summary judgment evidence, including RTC reports, but also by federal statutory law.

The RTC was created in 1989 with the passage of the Financial Institutions Reform, Recovery and Enforcement Act and charged with "resolving" failed thrifts. Pub.L. No. 101–73 § 501(b), 103 Stat. 183, 369 (1989) (codified at 12 U.S.C.A. § 1441a(b)(1)(A) (1998)); Pub.L. No. 101–73 § 101(7), 103 Stat. 183, 187 (1989) (published at 12 U.S.C.A. § 1811 Note (1998)). The RTC was thus authorized to assert the failed thrifts' causes of action against persons whose wrongful conduct allegedly contributed to the thrifts' losses. *See, e.g.,* 12 U.S.C.A. § 1821(k) (personal liability of officers and directors). However, while the RTC's own documents and testimony before the Senate Banking Committee establish the S & L bailout in Texas cost taxpayers at least $25 billion by the time the *Day One* broadcast aired, other summary judgment evidence establishes the RTC recovered only a small fraction of that amount from S & L officers and directors. Broadcast Statements 7–9 are thus true or substantially true. Accordingly, we reverse the trial court's order and render judgment in ABC's favor on the Gills' defamation claims arising out of these statements.

### 3. *The RTC's Failure to Sue the Gills*

(Broadcast Statements 10–20)

In Broadcast Statements 10–20, ABC questioned why the RTC had not recovered more from Texas S & L officers, directors, and other insiders, particularly the Gills:

What went wrong? [10] Well, we sent Robert Krulwich to San Antonio to find out.

ROBERT KRULWICH, ABC News: This used to be San Antonio Savings. They lost more than a billion dollars here. And this used to be Bexar Savings. They lost $686 million here. And this place is Gill Savings. It went bust and lost $1.4 billion. That's one thousand, four hundred million dollars.

[voice-over] And since Gill had the biggest losses here, we wondered how the RTC handled the Gill case. *Gill Savings was founded 20 years ago in Hondo, Texas,* [11] when the Gill family bought out a small town S & L called Medina Savings.

JACKIE WINKLER: *The Gills were those were the rich city folks.* [12] You know, we're—we're talking about Hondo, Texas, population 5,000, and they were just a different breed from from the folks here in Hondo.

ROBERT KRULWICH: [voice-over] *Jackie Winkler of Hondo remembers that once the Gills took over the S & L, suddenly its loan portfolio began to grow.* [13] Under the direction of *Christopher Gill, who declined to be interviewed for this broadcast,* [14] Gill Savings went from a mere $9 million in assets to a spectacular $1 billion.

JACKIE WINKLER: You know, *when you take it from $9 million to a billion in just a very few years, it things can't grow healthy and grow that fast, right?* [15]

ROBERT KRULWICH: Well, apparently, that is right, at least according to this in-house document, a memo prepared by the RTC's own lawyers and investigators and obtained by Day One. [voice-over] *The memo focuses on three loans and claims top officers who ran Gill Savings engaged in "negligent mismanagement," "fraudulent lending practices," "self-dealing," "insider abuse," "excessive compensation." Investigators concluded that those loans were 'negligently and imprudently made without full and current appraisals.* [16]

[interviewing] *So if the Gills were making loans without appraisals-*

ART LEISER: *They were violating the law.*[17]

ROBERT KRULWICH: [voice-over] Art Leiser was chief bank examiner for the state of Texas for 16 years.

[interviewing] *Why didn't somebody say, "Hey, you can't do this"?*

ART LEISER: *We did.*[18]

ROBERT KRULWICH: *What'd they do?*

ART LEISER: *Well, they subsequently went broke.*[19]

ROBERT KRULWICH: [voice-over] And then, as happened all over Texas, teams of RTC investigators moved in.

1st RTC OFFICER: You may have guessed why we're here.

ROBERT KRULWICH: [voice-over] The RTC took over 137 S & Ls in Texas.

2nd RTC OFFICER: I'm Larry Long. I'm be the managing agent of the Resolution Trust Corporation.

ROBERT KRULWICH: [voice-over] They seized all records of loans and transactions.

3rd RTC OFFICER: Well, yeah. We'll probably need to lock up things at night.

ROBERT KRULWICH: [voice-over] They secured the buildings and then they were supposed to find and sue those responsible for the losses and get money back for the taxpayers. The Gills say they did nothing wrong, but the RTC's team listed seven pages of allegations against the officers of Gill Savings and asked for authority to sue. Top RTC officials reviewed the claims and the filing of a civil lawsuit was approved by all of them. *The Gills were never sued.*[20]

ABC argues its questioning "[w]hat went wrong?" in Broadcast Statement 10, as well as Broadcast Statements 12, 13, and 15 regarding Mr. Winkler's comments, are not actionable assertions of fact, while Broadcast Statements 11, 14, and 16–20 are true or substantially true. We agree.

As discussed above in section IX.A.1, rhetorical hyperbole and opinion are not actionable under Texas law. Broadcast Statement 10 plainly falls into the category of rhetorical hyperbole. ABC asked, given the RTC's charge and the size of the bailout in Texas, "what went wrong?" This question was simply a set up for the story to follow. Just as clearly, Broadcast Statements 12, 13, and 15 are either expressions of opinion by Mr. Winkler or accurate characterizations of her opinions by the ABC anchor. And the summary judgment evidence conclusively establishes the truth or substantial truth of the facts underlying Mr. Winkler's opinions, as well as Broadcast Statements 11, 14, and 16–20.

Gill Savings was founded in the mid–1970s—approximately twenty years before this *Day One* aired—when the Gill family acquired what was then Medina Savings Association in Hondo, Texas. At the time of the purchase, the S & L had assets valued at approximately $9 million. By 1976, its asset value had tripled; and between 1976 and 1979, its asset and loan values more than doubled. In 1980, chief executive officer Christopher Gill embarked upon a strategic plan designed to create a "vertically integrated real estate enterprise" that invested heavily in commercial real estate developments, charging four to six points at the front end of acquisitions and construction loans and taking a fifty to eighty percent equity interest. As a result of this strategic plan, the S & L's asset and loan portfolios increased dramatically—more than doubling in 1980 alone. By the end of 1984, Gill Savings listed assets and loans valued at more than $1.3 billion and almost $1 billion, respectively.

Gill Savings' rapid growth did not go unnoticed by the Federal Home Loan Bank Board. As early as 1980, and continuing until the Gills' departure, FHLBB examinations criticized Gill Savings' inadequate appraisal reports. As early as 1981, soon after Christopher Gill's strategic plan was implemented, the FHLBB began criti-

cizing Gill Savings' heavy concentration in high-risk real estate loans. By 1985, the FHLBB concluded "[t]he association's major land acquisition, development, and construction loans are imprudently underwritten and expose the association to undue risk." Finally, in April 1986, because the association "fail[ed] to heed safe and sound banking practices and applicable regulations in the loan underwriting area," the FHLBB proposed a supervisory agreement, which was in place by the end of July 1986. By year end, Gill Savings reported an annual net loss in excess of $100 million and a negative net worth of $85.9 million. Shortly thereafter, in April 1987, Christopher and Peter Gill resigned their officer and director positions. Two years later, in February 1989, federal regulators placed the S & L in conservatorship. By mid–1990, Gill Savings was closed. The subsequent payment of federal deposit insurance cost United States taxpayers $1.4 billion.

In the wake of Gill Savings' failure, the RTC investigated its officers, directors, and other insiders. Ultimately, in an internal "authority to sue" memorandum, RTC Senior Counsel Kathleen Flake and Counsel R. Lee Anderson recommended the RTC attempt to recover some part of the $1.4 billion loss from the "directors and officers who most significantly contributed to failure." This recommendation was approved by the Assistant to the Chairman of the RTC, John F. Bovenzi, and concurred in by the RTC's General Counsel, its Deputy General Counsel, and its Assistant General Counsel, as well as its Deputy Executive Director and Regional Director. Subsequently, the RTC's attorneys drafted a complaint naming as defendants, among others, Christopher, Peter, and Richardson Gill. But the suit against the Gills was never filed.

In sum, ABC accurately reported the rise and fall of Gill Savings and the RTC's investigation of and allegations against the Gills. No more is required. *McIlvain,* 794 S.W.2d at 16 (holding the defendant established the substantial truth of its broadcast by proving it was consistent with the investigation and findings it reported); *KTRK Television v. Felder,* 950 S.W.2d 100, 106 (Tex.App.—Houston [14th Dist.] 1997, no writ) (same). The summary judgment evidence also conclusively establishes that, although Christopher Gill had two telephone conversations with an ABC staff member, he insisted these conversations be "off the record," and he would not agree to an on-camera interview.[4]

Because the summary judgment evidence establishes Broadcast Statements 10–20 are either true or substantially true assertions of fact or not assertions of fact at all, we reverse the trial court's order and render judgment in favor of ABC on the Gills' defamation claims arising out of these statements.

### 4. *The RTC's Failure to Sue the Gills*

(Broadcast Statements 21–23)

In Broadcast Statements 21–23, ABC asked an RTC lawyer why the RTC did not sue the Gills:

[interviewing] *Why didn't the RTC sue the Gill family to-*

TOM HINDES: I'm not going to-

ROBERT KRULWICH: *-recover money for the taxpayers?* [21]

TOM HINDES: I'm not going to talk about specific cases.

ROBERT KRULWICH: [voice-over] In Washington, Tom Hindes is the RTC's lawyer in charge of recovering money

---

4. In conjunction with Broadcast Statement 14, ABC mistakenly showed a video clip of Richardson, rather than Christopher, Gill, and this "statement," the Gills contend, defamed them. However, this "statement" was not defamatory as a matter of law; it did not expose the Gills to "public hatred, contempt or ridicule, or financial injury," nor did it "impeach [the Gills'] honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 1996).

from S & L wrongdoers. Often, he says, these lawsuits aren't worth pursuing.

TOM HINDES: Directors and officers are not the people with the most resources.

ROBERT KRULWICH: *But they're the guys who did it. They're the ones who did it.*

TOM HINDES: Well, they're not the only ones who did it.

ROBERT KRULWICH: *But they're the they ran the banks. They made these loans. They lost our money.*[22] We should get it back.

TOM HINDES: *If you stole a million dollars from me and then you spent it and you don't have any money I mean, I can sit here and say, "Well, I should get that million dollars back".*[23]

ROBERT KRULWICH: But you're not saying that all those people are impoverished now.

TOM HINDES: I'm not saying all of them are impoverished and where the resources are there to pursue a cost-effective and a valid claim, we pursue those claims.

ABC argues Broadcast Statement 21 is true, while Broadcast Statements 22 and 23 are not about the Gills. ABC also argues there is no evidence Broadcast Statement 22 was made with actual malice. The Gills contend the actual malice standard does not apply because they are not public figures and, even if it does, the statements directly accused them of making bad loans and losing taxpayer money, indirectly accused them of stealing a million dollars, and were made with actual malice. We disagree.

■■■■ To maintain a defamation action, a plaintiff must be referenced in the complained-of statement. *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 893 (1960). A person is referenced in a statement if she is named or if those who knew and were acquainted with her would understand the statement referred to her.

*Id.* Whether a plaintiff is referenced in a statement is a question of law. *See id.*

Broadcast Statement 21 contains only one conceivable assertion of objectively verifiable fact—the RTC did not sue the Gills—and the summary judgment evidence conclusively establishes this statement is true. Just as clearly, Broadcast Statement 22 and 23, when viewed in context, are not about the Gills and thus not actionable by them. The statements do not name or reference the Gills; Krulwich's voice-over introduction of Hindes reflects he is speaking in general terms about why the RTC might not pursue a civil action against officers and directors; Hindes made it clear he would not discuss any particular case; and he did not. Therefore, the pronouns "they" and "you" in Broadcast Statements 22 and 23 must relate back to "officers and directors" in the previous sentence, not to the Gills. Moreover, even if Broadcast Statement 22 could be interpreted by a reasonable viewer as referencing the Gills, there is no summary judgment evidence suggesting the statement was made with actual malice.

### a. *Applicability of the Actual Malice Standard*

■■■■ The actual malice standard applies to general and limited-purpose public figures. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex.1998). "The question of public-figure status is one of constitutional law for courts to decide." *Id.* One " 'generally accepted test' to determine limited-purpose public-figure status" is the three-part *Trotter/Waldbaum* test. *Id.* at 571–72. Under this test, an individual is a limited-purpose public figure if (1) he or she has more than "a trivial or tangential role" (2) in a controversy that is sufficiently public to be discussed and the resolution of which will likely be felt beyond its immediate participants, and (3) "the alleged defamation [is] germane to the plaintiff's participation in the controversy." *Id.* (citing *Trotter v.*

*Jack Anderson Enters., Inc.,* 818 F.2d 431, 433 (5th Cir.1987); *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–98 (D.C.Cir.1980)). To decide whether a plaintiff had more than a trivial or tangential role in a public controversy, "we must first determine the controversy at issue" and then examine whether, with respect to this controversy, the plaintiff sought publicity, had access to the media, or " 'voluntarily engag[ed] in activities that necessarily involve[d] the risk of increased exposure and injury to reputation.' " *McLemore,* 978 S.W.2d at 572–73 (quoting *Brewer v. Memphis Publ'g Co.,* 626 F.2d 1238, 1254 (5th Cir.1980)).

### (1) *The Controversy*

The Gills contend no public controversy existed before ABC manufactured one. But this contention is conclusively disproved by the summary judgment evidence.

In the early 1990s, a significant public debate arose over whether the RTC had adequately pursued officers, directors, and other insiders who contributed to the collapse of S & Ls across the country. This debate, which began quietly in 1992, long before ABC became interested in the story, was generated by the allegations of members of the public, current and former RTC employees, and United States Senators, particularly Senator John Kerry, of waste, fraud, and mismanagement in the RTC. The Senate Banking Committee thus held "whistleblower" hearings in September 1993 to determine whether the RTC had failed to aggressively pursue claims in Texas and elsewhere. Indeed, the chair of the committee, Donald W. Reigle, Jr., stated that it was "a very hot issue."

As a result of the hearings, the Treasury Department investigated and reported on the Dallas Office of the RTC's Professional Liability Section. Although this report was generally favorable to the RTC, the summary judgment evidence establishes it was disputed by RTC insiders, and it ultimately generated still further controversy. *See, e.g.,* Jack Anderson & Michael Binstein, *A Texas–Size S & L Scandal,* WASH. POST, June 27, 1994, at B08.[5] As a result, Senator Kerry opined in a July 1, 1994 floor speech that "one of the biggest stories that has not been focused on, either by the media or by the Congress, lies in the RTC's handling of lawsuits against savings and loan wrongdoers in Texas." Both the Anderson & Binstein article and Senator Kerry singled out the RTC's failure to pursue the officers, directors, and other insiders at Gill Savings—as the second largest S & L failure in Texas and the tenth largest in United States history—as a "glaring example" of the RTC's mismanagement and its effect on taxpayers, who ultimately funded the bailout. It was these events, the summary judgment evidence establishes, that generated ABC's interest in the controversy. Not, as the Gills contend, the other way around.[6]

However, contrary to ABC's contention, the summary judgment evidence also establishes the controversy was not limited to the RTC's performance of its charge. Rather, it extended to the collapse of the S & L industry, particularly in Texas, during the previous decade; the causes and costs of the ensuing bailout; and its aftermath, including the RTC's performance, and it was this debate that formed the core of "a real dispute, the outcome of which af-

**5.** The Anderson & Binstein article and the other articles cited in this opinion are included in the summary judgment evidence.

**6.** The Gills insist ABC created a public issue regarding their role in the controversy by planting the references to the RTC's investigation of Gill Savings in the Anderson & Binstein article and Senator Kerry's floor speech. But this theory is not supported by the summary judgment evidence. Rather, the evidence establishes Senator Kerry first learned of the Gill Savings investigation in the spring of 1994; the Gills' role in the controversy was referenced in the June 1994 Anderson & Binstein article and the July 1, 1994 floor speech by Senator Kerry; and it was not until months later, in September 1994, that ABC's notes reference the Gill Savings investigation.

fect[ed] the general public ... in an appreciable way." *Waldbaum,* 627 F.2d at 1296. The summary judgment evidence also leaves no doubt that Christopher, Peter, and Richardson Gill played more than tangential roles in this controversy.

### (2) *Christopher Gill*

From 1980 to 1987, Christopher Gill was at various times the chief executive officer of Gill Savings, and it thus became "a vertically integrated real estate enterprise" under his leadership. Indeed, in 1981, Christopher Gill publicly described the S & L's goal to become one of the state's top five S & Ls by 1986 and his strategic plan for achieving that goal. *See* Linda K. Gilliam, *Sizzling S & L,* Tex. Bus. Mag., Nov. 1981; Thomas W. Zippman, *Texas S & L Scoffs at Weakness; San Antonio S & L Claims Nation's Top Profitability,* Wash. Post, Jan. 2, 1982, at E8. And Christopher Gill's public role was not limited to Gill Savings. He also engaged in a concerted, public effort to prevent the passage of the 1986 Tax Reform Act, which he then maintained would cause a deep economic recession and which he now maintains was responsible for the collapse of the S & L industry. Gill conveyed his views in letters to bank and S & L presidents, members of the Texas Legislature, congressional leaders, governors, and the President and Vice President. Also reflective of Christopher Gill's significant public role in the controversy was his appointment to the Blue Ribbon Committee established by Congressman Jim Wright to evaluate and make recommendations to stabilize the Texas banking industry. Indeed, the Committee's position paper was in large measure authored by Christopher Gill.

In light of Christopher Gill's activities, we have no hesitancy in concluding he "voluntarily injected himself" into the controversy by seeking publicity and voluntarily engaging in activities that necessarily increased his exposure and the risk of injury to his reputation. *See McLemore,*

978 S.W.2d at 573. Nor do we have any doubt it was the S & L controversy and its aftermath that generated the statements of which he complains in this suit. *See id.* at 572.

### (3) *Richardson and Peter Gill*

Richardson Gill had no formal role in Gill Savings' management after 1975, but he continued as an owner of Gill Savings and as an owner and officer of entities with extensive business dealings with Gill Savings. He was also a large borrower of Gill Savings and a focus of two independent investigations and a special examination by the Office of Thrift Supervision, each of which concluded Gill Savings' loan committee—of which Peter Gill was a member—authorized loans characterized by the Office of Thrift Supervision as a "double land flip that allowed Richardson B. Gill to obtain over $3.3 million in two separate transactions ... and resulted in Gill Savings suffering losses in excess of $11.2 million." Similarly, three separate investigations commissioned by the Gill Savings' successor board reported Peter Gill received excessive compensation, and both Richardson and Peter Gill might be liable for Gill Savings' losses arising out of the Gill family's personal use of the corporate aircraft. Both Richardson and Peter Gill were thus among the six officers and directors identified by the RTC in the draft complaint as potential defendants. And they, along with Christopher Gill, were also indicted and ultimately acquitted of criminal bank fraud charges. After the widely-publicized acquittal, Richardson, like Christopher, made numerous statements to the press.

Unlike Christopher Gill, Richardson and Peter Gill did not seek publicity. But, like their brother, they voluntarily engaged in activities that necessarily increased their risk of exposure and injury to their reputations, and they had access to the media. We therefore conclude Richardson and Peter Gill, like their brother Christopher, became public figures for purposes of the

controversy by "choosing to engage in activities that necessarily involved increased public exposure and media scrutiny," "play[ing] more than a trivial or tangential role in the controversy and, therefore, [bearing] the risk of injury to [their] reputation[s]." *McLemore,* 978 S.W.2d at 573. Each is therefore subject to the actual malice standard.

### b. *The Actual Malice Standard*

■■■■■ "[T]he actual malice standard is *not* satisfied *merely* through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Rather, to establish "actual malice" in the defamation context, the plaintiff must produce "clear and convincing evidence that the defendant acted with a knowledge of falsity or with a 'high degree of awareness of . . . probable falsity.'" *Id.* at 681, 109 S.Ct. 2678 (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)). At a minimum, therefore, a defamation plaintiff must prove the defendant "'entertained serious doubts as to the truth of his publication.'" *Id.* at 667, 109 S.Ct. 2678 (quoting *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)).

■■■■■ "[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence," and "[i]n a case . . . involving the reporting of a third party's allegations, 'recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'" *Harte–Hanks,* 491 U.S. at 668, 688, 109 S.Ct. 2678 (quoting *St. Amant,* 390 US. at 732, 88 S.Ct. 1323). But evidence establishing a "[d]ifference of opinion as to the truth of a matter—even a difference of 11 to 1—does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a 'high degree of awareness of . . . probable falsity.'" *Id.* at 681, 109 S.Ct. 2678 (quoting *Garrison,*

379 U.S. at 74, 85 S.Ct. 209); *see also HBO v. Harrison,* 983 S.W.2d 31, 42 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("a difference of opinion among the people involved and represented" "does not prove that anyone involved in the production of the film subjectively believed the statements in the film were untrue"). Similarly insufficient is evidence the defendant made an "editorial choice to exclude certain information" or simply failed to investigate or verify information; rather, "[t]here must be evidence at least that the defendants purposefully avoided the truth." *Id.*

### c. *The Gills' Actual Malice Evidence*

■■■ The summary judgment record does not contain any direct evidence that any *Day One* producer, anchor, or reporter made Broadcast Statement 22 with actual knowledge it was false or with a high degree of awareness it was false. Indeed, the contrary is established by the direct evidence—the affidavits of the story's producers, William "Rocky" Kistner and Glenn Silber, and its correspondent, Robert Krulwich. Therefore, to sustain their summary judgment burden to produce some evidence of actual malice, the Gills argue an inference of actual malice may be gleaned from summary judgment evidence establishing ABC knew the RTC closed its investigation of the Gills in February 1992 for lack of merit and notified the Gills accordingly in a March 1992 letter. We cannot agree. Although the view espoused by the Gills was expressed during ABC's conversations with Christopher Gill and its interviews with two RTC attorneys, Kip Byrne and Mark Greenwald, other sources expressed a different view, and it was this different view that Kistner, Silber, and Krulwich ultimately came to believe.

In their affidavits, Kistner, Silber, and Krulwich describe the genesis of ABC's interest in a story about the RTC's performance in Texas; the materials Kistner and Silber reviewed and the people they interviewed; and how, after researching a number of failed Texas S & Ls, they de-

termined Gill Savings was an appropriate illustration of a savings and loan failure and, in light of its charge, the RTC's failure. Kistner and Silber reached this conclusion in light of former RTC lawyers' and investigators' repeated reference to Gill Savings "as an example of the RTC's failure to pursue insiders of failed institutions," as well as the memorandum requesting authority to sue the Gills and the draft complaint that was prepared but never filed—documents Kistner and Silber believed to be authentic and reliable and which contained detailed allegations that bad loans were made by Gill Savings. Conversely, Byrne's interviewer did not believe Byrne at the time of the interview, and other sources said Byrne and Greenwald were "not on the level" and were "dirty." Ultimately, Kistner's and Silber's sources substantiated much of what they had read in the June 1994 Anderson & Binstein article and in the transcript of Senator Kerry's July 1, 1994 floor speech. They also learned—contrary to the Gills' assertion the investigation was closed in February 1992—the RTC in fact approved a $720,000 budget for the Gill case in May 1992, the Gill case was still open in April 1993 when it was transferred from Greenwald to another RTC attorney, the RTC's outside law firm did not close its file until October 1994, and a "closeout memo" had never surfaced. Additionally, as ABC points out, the March 1992 letter did not signal a definitive end to the RTC's investigation of the Gills; the letter goes on to say, "This is not to say that claims . . . will not be pursued at a later date." Thus, while Christopher Gill, Byrne, and Greenwald maintained the Gill investigation was closed in February 1992, their assertions were substantially belied by other sources, and ABC's producers ultimately found these other sources more credible. In short, ABC producers made an "editorial choice" protected by the First Amend-

ment. Consequently, that some people believed the RTC's investigation of the Gills concluded in February 1992 cannot yield an inference of actual malice.

■ The Gills next argue a jury could reasonably infer ABC purposefully avoided the truth—the falsity of the allegations in the authority to sue memorandum and the draft complaint—from evidence establishing ABC obtained a copy of the indictment in the criminal proceeding and knew the Gills had been acquitted but then refused to obtain and review the record in the criminal proceeding.[7] We again disagree. As ABC points out, an acquittal does not establish the charge was false; it merely establishes the government failed to prove the charge beyond a reasonable doubt—a standard that does not obtain in and thus does not preclude a subsequent civil proceeding arising out of the same facts. State v. Benavidez, 365 S.W.2d 638, 640 (Tex.1963); City of Houston v. Dillon, 596 S.W.2d 212, 214 (Tex.Civ.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Moreover, given the very limited and focused nature of the criminal proceeding and the much broader reach of the authority to sue memorandum and the draft complaint, it is difficult to see how reading the record in the criminal proceeding would have enabled ABC to determine the truth or falsity of most of the allegations in the proposed civil suit.

The Gills next argue actual malice may be inferred from evidence suggesting the Day One "story was going to be killed if it did not tell a tale of negligence," regardless of the truth of that story. In support of this contention, the Gills point to a note in an ABC document: "4. Could be resolved Before Jan. 95? put negligence Back in Kill story." However, the Gills' interpretation of this note is not supported by the summary judgment evidence. The note was item number four in a three-

---

7. ABC argues the record in the criminal proceeding is not included in the summary judgment evidence because it was never properly authenticated, and its objection on this basis was sustained. ABC's assertion appears to be supported by the record, but it is less than clear. Therefore, we prefer to address the Gills' argument on its merits.

page, five-item list, entitled *"NY Times—Monday Banking Bill."* This list does not refer to Gill Savings, the Gills, or the RTC, and the first three items, like its title, expressly refer to proposed legislation concerning the statute of limitations to be applied in cases against S & L officers and directors. Item three thus states: "Bill passed House neg. + fraud—Senate Bill? *Conf.*—somebody *threw out negligence*—Who?" Given this context, interpreting item four as evidence that ABC acted with reckless disregard for the truth amounts to "[m]ere surmise or suspicion of malice." *Schauer*, 856 S.W.2d at 450. This evidence thus "does not carry the probative force necessary to form the basis of a legal inference of malice." *Id.*[8]

█ Finally, the Gills argue actual malice may be inferred from evidence establishing ABC did not report either the many favorable comments about the Gills and their management of Gill Savings or the explanations by Christopher Gill and others of the "real" reasons for S & L failures generally and the Gill Savings' failure in particular. However, as discussed above, ABC was not under a "legal obligation to present a 'balanced view.'" *Dolcefino v. Turner*, 987 S.W.2d 100, 121 (Tex. App.—Houston [14 th Dist.] 1998, pet. filed) (quoting *Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 412 (6th Cir.1991)). Rather, ABC was entitled to exercise editorial control and judgment. *Harrison*, 983 S.W.2d at 42. Accordingly, that ABC omitted information favorable to the Gills from the *Day One* broadcast is not evidence of actual malice.

Because the only objectively verifiable assertion of fact in Broadcast Statement 21 was true, we reverse the trial court's order and render judgment in ABC's favor on the Gills' defamation claims arising out of this statement. We also reverse and render judgment in ABC's favor on the Gills' defamation claims arising out of Broadcast Statements 22–23 because these statements are not about the Gills and there is no evidence Statement 22 was made with actual malice.

### 5. *Laura and Christopher Gill's Assets*

(Broadcast Statements 24–27)

█ As the Gills correctly contend, Laura Gill was never a Gill Savings officer or director or a participant in its management. In short, Laura Gill was "never involved in Gill Savings." She was therefore referred to only in Broadcast Statements 24–27:

*Well, were the Gills too poor to sue?*[24] *We checked and discovered that after Gill Savings went broke, Christopher Gill and his wife still owned or were partners in the Butterfield apartments, the Spanish Main apartments, Walnut Grove apartments, Briarbend apartments, all of the Austin–San Antonio area. They also had a vacation home in Beaver Creek, Colorado, a posh ski resort outside of Vail, not to mention another vacation home on the Texas Gulf coast, a 2,000–acre ranch and a residence in the most exclusive part of San Antonio.*[25]*And the memo shows the RTC itself determined that Christopher Gill had at least $3.7 million.*[26] *So they had money.*[27]

ABC contends Broadcast Statement 24 is not actionable because it is not an assertion of fact, and Broadcast Statements 25–27 are not defamatory and are substantially true, and the remaining broadcast statements are not about and thus not actionable by Laura Gill. We agree.

█ A statement is defamatory if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's

---

**8.** To support this argument, the Gills also point to several magazine articles discussing the competition among news magazine shows, their high profitability, and their need to produce to maintain their ratings. However, these articles were excluded from the summary judgment record when ABC's hearsay objection to the articles was sustained.

honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem.Code Ann. § 73.001 (Vernon 1996). Whether the words used are capable of a defamatory meaning is a question of law. *Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 654 (Tex. 1987). The allegedly libelous statements must be construed "as a whole, in light of surrounding circumstances based upon how a person of ordinary intelligence would perceive the entire statement." *Id.* at 655.

Broadcast Statements 1–23 and 28–39 do not name or refer to Laura Gill and are therefore not actionable by her. *See, e.g., Matthews,* 339 S.W.2d at 893–94. Nor is Broadcast Statement 24 actionable by any of the Gills; it is not an assertion of fact but at best rhetorical hyperbole. *See Milkovich,* 497 U.S. at 19–20, 110 S.Ct. 2695. And Broadcast Statements 25–27 are simply not defamatory as a matter of law. That a person has substantial assets does not "tend[ ] to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach [his] honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem.Code Ann. § 73.001. Moreover, the summary judgment evidence establishes these statements were substantially true: Gill Savings was placed under the conservatorship of the FSLIC in February 1989 and closed in June 1990; RTC investigators estimated Christopher Gill's net worth at $3.7 million; and, before February 1989 and continuing after June 1990, Christopher and Laura Gill owned or were partners in each of the listed assets—and others not mentioned by ABC—except they did not acquire the Briarbend Apartments until 1993 and their interest in the 2000–acre ranch was limited to an undivided interest in 1259 acres. The facts as reported by ABC are thus plainly no more "damaging" than the truth. Likewise of no moment is whether the Gills lived in an exclusive part of San Antonio or the most exclusive part. As a matter of law, these discrepancies do not affect the substantial truth of the statements.

Because Broadcast Statements 1–23 and 28–39 are not about Laura Gill, we reverse the trial court's order and render judgment in ABC's favor on her defamation claims arising out of these statements. We also reverse and render judgment in ABC's favor on the Gills' claims arising out of Broadcast Statement 24, because it is not an assertion of fact, and Broadcast Statements 25–27, because they are not defamatory and are substantially true as a matter of law.

### 6. *Political Pressure as an Explanation*

(Broadcast Statements 28–29)

■ In Broadcast Statements 28–29, ABC explored one RTC attorney's analysis of the RTC's failure to pursue the Gills:

ROBERT KRULWICH: [voice-over].... *So why didn't the RTC sue?*

SHARON HOWARD: *Well, I can't believe it just fell through the cracks, so I have to believe that there was some other kind of pressure brought to bear.*

ROBERT KRULWICH: Attorney Sharon Howard was part of the RTC's money recovery team in Dallas and *she smelled politics.*[28]

SHARON HOWARD: *What makes me think that there may have been some political motivation is the fact that the major complex cases were being retained in Washington and those cases somehow, from the ones that I've seen, particularly from San Antonio, the cases were not pursued.*

ROBERT KRULWICH: *So somebody wanted those cases back in Washington.*

SHARON HOWARD: *Uh-huh.*

ROBERT KRULWICH: *And somebody who got them back in Washington didn't prosecute them.*

SHARON HOWARD: *Right.*[29]

ABC contends these statements are not assertions of fact. We agree. These statements are, quite plainly, expressions

by Ms. Howard of her opinion that political pressure may have been a factor in the RTC's failure to sue the Gills. *See Evans v. Dolcefino*, 986 S.W.2d 69, 78 (Tex. App.—Houston [1st Dist.] 1999, no pet. h.). And, while the Gills correctly contend ABC compiled this segment from pieces of its interview with Ms. Howard, a review of the whole reflects ABC did so in a manner that accurately stated her opinion. Consequently, these statements are not actionable under Texas law, and we therefore reverse the trial court's order and render judgment in ABC's favor on the Gills' defamation claims arising out of these statements.

### 7. *Failure to Issue Subpoenas as an Explanation*

(Broadcast Statements 30–35)

 In the next five statements, ABC explored the extent to which the RTC's failure to issue subpoenas played a role in its failure to fully accomplish its charge:

BILL DePUGH: Things are delayed. Things are set aside. *Certain tasks are not done that might lead to certain people.*[30]

ROBERT KRULWICH: [voice-over] Bill DePugh had been a government investigator for more than 30 years. Once chief of criminal investigations for the IRS in Manhattan, he had now become the RTC's head of investigations in Texas and he, too, was suspicious of his own bosses.

BILL DePUGH: They wouldn't give us subpoenas. They wouldn't answer phone calls. They lied to us. I mean, you've I figured, "What's going on here?"

ROBERT KRULWICH: [voice-over] *Well, one thing wasn't going on. The RTC never issued a single subpoena in its investigation of the Gills.*[31] *The memo shows they did not demand to see the Gills savings accounts or certificates of deposit or stocks or bonds.*[32] And DePugh says this happened in case after case.

BILL DePUGH: *Now, if we have subpoena power and do not use it to follow that money trail and find out where the assets are hidden or where they went or how they got there, we're not doing our job.*[33]

TOM BURNSIDE: I mean, one of the big things that you had to do in Texas was you had to figure out "Where'd the money go?"

ROBERT KRULWICH: [voice-over] Tom Burnside left a good corporate law job in St. Louis and worked side by side with Bill DePugh in Dallas. He, too, says subpoenas are essential to getting money back.

TOM BURNSIDE: *The people that were running these institutions are smart people. They're not going to leave notes in their files saying, "Ha, ha! I took the money and this is where you're going to find it."*[34]

ROBERT KRULWICH: [voice-over] But in Washington, Tom Hindes says subpoenas aren't always necessary.

TOM HINDES: We have ability to determine whether people have assets or not without using subpoenas.

ROBERT KRULWICH: [voice-over] He says that, at first, it was not clear the RTC had been given full subpoena power by Congress, so they decided to use them very sparingly.

[interviewing] *You were going to go out and look around for documents and everybody would just hand them to you. "Here, take my financial statements. Here, look through my bank account. Here, find out all my stocks and bonds. Here, check all the things that I have hidden in my house." No one's going to do that.*[35]

TOM HINDES: Well, it may surprise you to know that there are a lot of people who do that.

Sen. JOHN KERRY, (D), Massachusetts: The results of this lack of subpoena were catastrophic.

ROBERT KRULWICH: [voice-over] Last year, when Senator John Kerry asked about the lack of subpoenas in Texas, the RTC reported back it hadn't issued a single subpoena in about two thirds of its failed S & Ls.

Sen. JOHN KERRY: There's a pattern of avoidance here that raises very serious questions about whether or not there was political influence.

ABC argues these statements are not defamatory of the Gills as a matter of law. We agree.

Whether the RTC had subpoena power and whether it should have exercised it in the Gill case did not does not expose the Gills to "public hatred, contempt or ridicule, or financial injury," nor does it "impeach [their] honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001. We therefore reverse the trial court's order and render judgment in favor of ABC on the Gills' defamation claims arising out of these statements.

### 8. *The Criminal Proceeding*

(Broadcast Statements 36–37)

 In the next two statements, Senator John Kerry explained the result of the criminal proceeding against the Gills:

ROBERT KRULWICH: [voice-over] Senator Kerry has taken a particular interest in the Gill case.

Sen. JOHN KERRY: Well, I took an interest in that case because it is one of those cases where you have a very significant loss, but also because there was a criminal investigation.

ROBERT KRULWICH: What happened in the criminal proceeding?

Sen. JOHN KERRY: *In the criminal proceeding, there was some presentation of evidence to a judge.*[36] *He found there was insufficient evidence for a criminal finding and so that was dismissed.*[37]

ABC contends Senator Kerry's statements are true or substantially true. We agree.

The summary judgment record conclusively establishes that, after the prosecution presented its case, the trial court granted the Gills' motion for a judgment of acquittal. We therefore reverse the trial court's order and render judgment in favor of ABC on the Gills' defamation claims arising out of these statements.

### 9. *The Statute of Limitations and the Failure to File a Civil Suit*

(Broadcast Statements 38–39)

 In the last two broadcast statements of which the Gills complain, ABC concluded this aspect of its story:

ROBERT KRULWICH: [voice-over] But Senator Kerry wondered why didn't the RTC simply file a civil suit for money, a much easier standard?

Sen. JOHN KERRY: Oh, a much easier standard. A much easier standard and a clear standard to be able to try to recoup some money.

ROBERT KRULWICH: [voice-over] *But by the time the judge dismissed the Gills' criminal case, the time to sue had run out.*[38]

[on camera] *So no court ever got the chance to decide if the Gills owe the taxpayers money and, as of this moment, except for one settlement with a Gill lawyer, the taxpayers got nothing back in the Gill case.*[39] . . . .

ABC contends Broadcast Statement 38 is not defamatory as a matter of law, while Broadcast Statement 39 is true or substantially true. We agree.

Whether the statute of limitations had run on the tort claims outlined in the RTC's draft complaint did not tend to expose the Gills "to public hatred, contempt or ridicule, or financial injury" nor would it "impeach [their] honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001 (Vernon 1996). And, taken in context, Broadcast Statement 39 plainly refers to the RTC's not having filed a civil recovery suit against the Gills, which the summary judgment evidence conclusively

establishes is true. We therefore reverse the trial court's order and render judgment in favor of ABC on the Gills' defamation claims arising out of these statements.

## B. DEFAMATION ARISING OUT OF THE BROADCAST AS A WHOLE

■ The Gills contend the March 2, 1995 *Day One* broadcast as a whole defamed them. However, a series of statements is not and cannot be actionable when no statement within the series is actionable. *See Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995) (rejecting slander by implication when each statement in a series was true, qualifiedly privileged, or made without actual malice); *Fowkes,* 981 S.W.2d at 789. We therefore reverse the trial court's order and render judgment in ABC's favor on the Gills' defamation claims arising out of the broadcast as a whole.

## C. DEFAMATION DURING THE NEWS GATHERING PROCESS

■ ABC also argues it is entitled to summary judgment on the Gills' defamation claims arising out of fifty-six questions posed and statements made during the news gathering process. We agree.

■ As ABC contends and as discussed above in relation to the broadcast statements, many of the fifty-six news gathering statements of which the Gills complain do not contain assertions of verifiable fact, *see* Appendix 2 (Statements 1–3, 8–10, 12–13, 16, 18, 21–23, 26, 28–29, 32–37, 40); and eight of the complained-of news gathering statements are not defamatory as a matter of law, *see id.* (Statements 4, 11, 24, 31, 38, 41, 51–52). Additionally, ABC either proved the substantial truth of eleven of the fifty-six news gathering statements, or the Gills failed to produce any summary judgment of their falsity. *See id.* (Statements 6, 19, 30, 42–44, 46, 53–56). For example, in News Gathering Statements 42, 43, and 46, Krulwich indicated the Gills gave themselves very large bonuses even in years in which Gill

Savings performed poorly, and the substantial truth of this assertion is established by the summary judgment evidence. Peter Gill, for instance, received a $1 million bonus in 1986 when Gill Savings reported a $100 million dollar net loss. Similarly, in News Gathering Statements 53–55, Krulwich stated "the Gills would sometimes be the people to whom Gill Savings and Loan was lending to," and the summary judgment evidence establishes Gill Savings approved a $5.8 million loan to Bee Caves Partners, Ltd. for the Bee Caves project two days after Richardson Gill submitted a loan application and before an appraisal was issued. And the general and limited partners of Bee Caves Partners, Ltd. were Jeanco, Inc. (a corporation wholly owned by Richardson Gill) and The Richard Gill Company (a wholly owned subsidiary of Gill Savings). We therefore reverse the trial court's judgment as to the Gills' defamation claims arising out of News Gathering Statements 1–4, 6, 8–13, 16, 18–19, 21–24, 26, 28–38, 40–44, 46, 51–56 and, as to these claims, render judgment in ABC's favor.

### 1. *Special Treatment for Texas and Texans*

(News Gathering Statements 5 and 7)

■ In News Gathering Statements 5 and 7, Krulwich inquired of Sharon Howard and Linda Alvarez whether Texas and Texans received special treatment from the RTC:

Aren't you surprised by the coalition of Texans everywhere? It's, after all, it's Texas judges that have held you to the strictness standards of proof. It's Texas politicians who have tended to protect their friends. It is the Texas delegation when it gets into these conference committees, that says no extensions. Isn't Texas just helping itself to eight hundred billion dollars of whatever this sum of money is, and it's telling the rest of the country, you paid, we keep it, go away.[5]

But somehow the rules for savings and loan executives in this state were, you were allowed to feed at the trough a little bigger meal than other states do.[7]

ABC contends these statements are not defamatory of the Gills. We agree; nothing in these statements "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem. Code Ann. § 73.001. We therefore reverse the trial court's order and render judgment in ABC's favor on the Gills' claims arising out of News Gathering Statements 5 and 7.

## 2. The RTC's Failure to File a Civil Suit

(News Gathering Statement 25)

▮ In News Gathering Statement 25, the ABC correspondent erroneously stated no criminal prosecutions had been filed in San Antonio and then commented on why the RTC should "arguably" have filed a civil recovery suit against the Gills:

In a place like San Antonio there was a lot of mischief going on, and yet in the town of San Antonio, that area, there have been no criminal prosecutions. The Gill family is a big family there and they have arguably lost an awful lot of money that the taxpayers might recover and there are other such things, other such organizations and families in that area and there's nothing happening there.[25]

ABC argues it is entitled to summary judgment on the Gills' defamation claims arising out of these statements because the statement regarding "criminal prosecutions" is not defamatory and there is no evidence the second statement was made with actual malice. We agree. As discussed above with respect to Broadcast Statement 22, the summary judgment record contains no evidence tending to establish ABC acted with actual malice with respect to News Gathering Statement 25.

Indeed, the record conclusively establishes the contrary. We therefore reverse the trial court's judgment on the Gills' claims arising of these statements and render judgment in ABC's favor.

## 3. Tracing Depositors' Money

(News Gathering Statements 14, 15, and 17)

▮ In News Gathering Statements 14, 15, and 17, ABC discussed with Sharon Howard and Linda Alvarez whether the RTC could trace depositor's money to wrongdoers or their assets:

ROBERT KRULWICH: If I had negligently, somehow or another, taken my depositors money and taken say $10,-000,000 of money and spends it on a sail boat which sank, drinks which I drank, vacation which I took, and I have $10,-000 left.[14]

ROBERT KRULWICH: Suppose I took some of my depositors' money at my savings and loan, and I spent a whole lot of it on me, and a hunk of it is still on my house. My very beautiful house, which has a swimming pool, playroom media center, and a whole lot of extras. A many million dollar house and that's all I have.[15]

ROBERT KRULWICH: The Gill case, for example, where there's this whole family and off they go, you know, life goes right on. And yet you can attach to some of these people rather large sums of money which are either still missing or you, even in some of these things, you even know exactly where the money is.[17]

ABC contends News Gathering Statements 14 and 15 do not contain verifiable assertions of fact, and Statement 17 is not defamatory as a matter of law. We agree.

News Gathering Statements 14 and 15 posit hypotheticals, as evidenced by Krulwich's use of the words "if" and "suppose." A hypothetical is not susceptible of proof and is therefore not actionable. But we

cannot agree News Gathering Statement 17 does not contain a verifiable assertion of fact. In this statement, Krulwich states "you can attach some rather large sums of money to [the Gills]," and these "rather large sums of money" are "still missing or you, even in some of these things, you even know exactly where the money is." Whether large sums of money could be "attached" to the Gills and whether they were "missing" or traced is capable of being proved true or false.

■ ABC next contends News Gathering Statement 17 is not defamatory as a matter of law. We agree. To "attach" "rather large sums of money" to the Gills and note that these "rather large sums of money" are either "still missing" or are traceable merely states that the Gills had "rather large sums of money," and they either still have them or they spent them. That the Gills had rather large sums of money and either kept or expended them does not equate with spending money that was not theirs; it thus does not "tend[ ] to injure the [Gills] reputation[s] and thereby expose [them] to public hatred, contempt or ridicule, or financial injury or to impeach [their] honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001.

Because News Gathering Statements 14–15 do not contain verifiable assertions of fact and News Gathering Statement 17 is not defamatory as a matter of law, we reverse the trial court's judgment and render judgment in ABC's favor on the Gills' defamation claims arising out of these statements.

### 4. *"Criminals Going Free"*

(News Gathering Statement 20)

■ In News Gathering Statement 20, Silber and Krulwich asked Tom Burnside how he felt about "criminals going free":

GLENN SILBER: Uh, Robert, can you pose a question about the people who caused these losses, got rich, and are still having a great time, having stashed money wherever? I'd like to know how he feels about it, about criminals going free, as a result of all this. ROBERT KRULWICH: And for those people who are able to take the money and run, whom you were not allowed to catch up with, where does that leave you thinking about them and about you? [20]

ABC argues this statement does not contain a verifiable assertion of fact. We agree.

As discussed above, a statement of opinion is not an assertion of fact and thus not actionable. *Carr*, 776 S.W.2d at 570. Whether a statement constitutes an opinion or contains an assertion of fact presents a question of law for the court. *Id.* A statement is actionable only if it can " 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at 20, 110 S.Ct. 2695 (quoting *Hustler Magazine, Flynt v. Falwell*, 485 U.S. 46, 50, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

When News Gathering Statement 20 is viewed in the context in which it was made, it cannot reasonably be interpreted as stating actual facts about anyone. Rather, the statement reflects what ABC already knew to be "whistleblower" Tom Burnside's views as a result of his congressional testimony and his July 23, 1994 *New York Times* essay entitled "The Great Texas Bank Robbery." ABC thus paraphrased Burnside's views of "what went wrong" as a lead in to asking him, given his views, how he felt about himself and the people he believed were "a major cause of the [S & L] industry's collapse"— the "crooks and incompetents who ran the Texas thrift industry," as well as "the Government officials who have largely failed to investigate them" and who purposefully "set up a system to avoid [the] risk" of "a high-profile lawsuit" by refusing to exercise the agency's subpoena power, a power "explicitly" given the agency by Congress "so that it could follow the money trail." Thomas J. Burnside, *The Great Texas Bank Robbery*, N.Y. TIMES, July 23, 1994, at 19.

In short, when viewed in the light of Burnside's previously expressed opinions, Silber's statement cannot reasonably be viewed as stating actual facts about anyone; it simply paraphrased Burnside's views as a lead in to Krulwich's question— "And for those people who are able to take the money and run, whom you were not allowed to catch up with, where does that leave you thinking about them and about you?" Because neither Silber's statement nor Krulwich's question can reasonably be viewed as stating an actual fact about anyone, News Gathering Statement 20 is not actionable and we reverse the trial court's judgment and render judgment in ABC's favor as to this statement.

### 5. Failure to Issue Subpoenas to the "Bad Guys"

(News Gathering Statements 27 and 39)

■ In News Gathering Statements 27 and 39, Krulwich asked Tom Hindes about the RTC's failure to issue subpoenas to the "bad guys":

> Well, going back to the early 90's. Let me just do that. And I presume, conclude, from this that you had no doubts that you could go ahead without subpoenas and find bad guys at University Savings, where two point four billion dollars disappeared—no subpoenas. Bright Banc Savings, one point five billion dollars disappears—no subpoenas. Gill Savings, one point four billion—no subpoenas.[27][39]

ABC argues this statement is not actionable because it is not defamatory and does not contain a verifiable assertion of fact. We agree.

News Gathering Statements 27 and 39 make two assertions. To paraphrase, (1) no subpoenas were issued in the RTC's investigation of the listed S & Ls, but (2) Krulwich concluded Hindes "had no doubts that he could go ahead without subpoenas and find bad guys" at each of the listed S & Ls where billions of dollars "disappeared." The first of these assertions is not defamatory as a matter of law; the RTC's failure to issue subpoenas in its investigation of Gill Savings or any other S & L does not "tend[ ] to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM.CODE ANN. § 73.001. And the second assertion cannot reasonably be interpreted as a statement of actual fact, *i.e.*, the Gills were "bad guys" who caused $1.4 billion to disappear. Rather, Krulwich merely states his understanding of Hindes' opinion that subpoenas were not necessary to find "bad guys" at the Texas S & Ls that sustained large losses. We therefore reverse the trial court's order and render judgment in ABC's favor on the Gills' defamation claims arising out of these statements.

### 6. Subsidiary to Pay Utility Bills

(News Gathering Statements 47–50)

■ In News Gathering Statements 47–50, ABC investigated a lead indicating the Gills formed a Gill Savings subsidiary to pay Mrs. Gill's utility bills:

> GLENN SILBER: There is something that Don told me. They had one subsidiary that helped the mom. Could you mention that briefly? Just help me explain.[47]

> ROBERT KRULWICH: Is it unusual for a savings and loan to have a subsidiary that pays your Mom's utility bills? . . . Can you explain this, what they had there going there with the Mother. It was a company designed to pay her bill?[48]

> ROBERT KRULWICH: Now, they had a Mom who, somewhat embarrassingly, they had set up a whole subchapter company to pay her electric bills or something.[49]

> ROBERT KRULWICH: Now, we've come across one that simply took care of mom. . . . We found one subsidiary that

just paid basically the mom's bills, mama Gill's bills.[50]

ABC argues there is no evidence these statements were made with actual malice. We agree.

ABC's interview notes indicate a source stated the Gills formed a subsidiary to make personal payments for Mrs. Gill. ABC followed up on this lead in its taped interview of Don Woods (Statements 47 and 50), who verified he was a source of this information and then told ABC what he knew, and in later interviews with Leiser and Buxie (Statements 48 and 49), both of whom indicated they knew nothing about the matter. There is no evidence ABC pursued the matter further. Accordingly, there is no evidence ABC made these statements with knowledge they are false or with reckless disregard for their truth. We therefore reverse the trial court's judgment and render judgment in ABC's favor on the Gills' claims arising out of News Gathering Statements 47–50.

## X. CONCLUSION

ABC established it was entitled to a summary judgment on all of the Gills' claims. We therefore reverse the trial court's order denying ABC's motion for summary judgment in its entirety and render judgment in ABC's favor.

## APPENDIX 1

### March 1–2, 1995 Promotional Statement

*While Washington talks about cutting school lunches, big shots are living high . . . after losing tens of billions of your tax money. What's worse, we can't get it back. If this doesn't make you mad, you're not paying attention.*[1]

### Excerpt of March 2, 1995 *Day One* Broadcast

ANNOUNCER: This is an ABC News magazine, Day One.

. . . .

FORREST SAWYER, ABC News: [voice-over] *A story that will make you see red about big shots living high after losing billions of your tax dollars.*[2]

ART LEISER: *You talk about, "Well, the government's going to lose $500 billion." That's us! That's you and me.*[3]

BILL DePUGH: *As a taxpayer. I figure I got screwed. Again.*[4]

FORREST SAWYER: *Robert Krulwich uncovers a shocking new twist in the biggest financial scandal in U.S. history.*[5]

. . . .

[Commercial Break]

Savings and Loan Questions

ANNOUNCER: From T.V.–1 in New York, Day One continues.

DIANE SAWYER: Remember when we were all up in arms in this country about *the savings and loan scandal, its combination of wild lending, greed, and in some cases, I guess, bad luck?*[6]

FORREST SAWYER: What a scandal it was. At the end of the day, it could cost us $500 billion. You know, the government told us they were going to set up the Resolution Trust Corporation, the RTC, to collect at least some of that money and *go after the bad guys.*[7]

DIANE SAWYER: And it's now been six years. The term of the RTC is about to run out. And a good time, I think, to go back and look and see what it accomplished.

*We went to Texas, the state where American taxpayers lost at least $25 billion.*[8] *Now, so far in Texas, the RTC has recovered only about one tenth of one percent from the people who ran those institutions and were responsible for all those bad loans.*[9]

*What went wrong?*[10] Well, we sent Robert Krulwich to San Antonio to find out.

ROBERT KRULWICH, ABC News: This used to be San Antonio Savings. They lost more than a billion dollars here. And

this used to be Bexar Savings. They lost $686 million here. And this place is Gill Savings. It went bust and lost $1.4 billion. That's one thousand, four hundred million dollars.

[voice-over] And since Gill had the biggest losses here, we wondered how the RTC handled the Gill case. *Gill Savings was founded 20 years ago in Hondo, Texas,*[11] when the Gill family bought out a small town S & L called Medina Savings.

JACKIE WINKLER: *The Gills werethose were the rich city folks.*[12] You know, we're—we're talking about Hondo, Texas, population 5,000, and they were just a different breed fromfrom the folks here in Hondo.

ROBERT KRULWICH: [voice-over] *Jackie Winkler of Hondo remembers that once the Gills took over the S & L, suddenly its loan portfolio began to grow.*[13] Under the direction of *Christopher Gill, who declined to be interviewed for this broadcast,*[14] Gill Savings went from a mere $9 million in assets to a spectacular $1 billion.

JACKIE WINKLER: You know, *when you take it from $9 million to a billion in just a very few years, itthings can't grow healthy and grow that fast, right?*[15]

ROBERT KRULWICH: Well, apparently, that is right, at least according to this in-house document, a memo prepared by the RTC's own lawyers and investigators and obtained by Day One.

[voice-over] *The memo focuses on three loans and claims top officers who ran Gill Savings engaged in "negligent mismanagement," "fraudulent lending practices," "self-dealing," "insider abuse," "excessive compensation." Investigators concluded that those loans were "negligently and imprudently made without full and current appraisals."* [16]

[interviewing] *So if the Gills were making loans without appraisals-*

ART LEISER: *They were violating the law.*[17]

ROBERT KRULWICH: [voice-over] Art Leiser was chief bank examiner for the state of Texas for 16 years.

(interviewing] *Why didn't somebody say, "Hey, you can't do this"?*

ART LEISER: *We did.*[18]

ROBERT KRULWICH: *What'd they do?*

ART LEISER: *Well, they subsequently went broke.*[19]

ROBERT KRULWICH: [voice-over] And then, as happened all over Texas, teams of RTC investigators moved in.

1st RTC OFFICER: You may have guessed why we're here.

ROBERT KRULWICH: [voice-over] The RTC took over 137 S & Ls in Texas.

2nd RTC OFFICER: I'm Larry Long. I'm be the managing agent of the Resolution Trust Corporation.

ROBERT KRULWICH: [voice-over] They seized all records of loans and transactions.

3rd RTC OFFICER: Well, yeah. We'll probably need to lock up things at night.

ROBERT KRULWICH: [voice-over] They secured the buildings and then they were supposed to find and sue those responsible for the losses and get money back for the taxpayers. The Gills say they did nothing wrong, but the RTC's team listed seven pages of allegations against the officers of Gill Savings and asked for authority to sue. Top RTC officials reviewed the claims and the filing of a civil lawsuit was approved by all of them. *The Gills were never sued.*[20]

[interviewing] *Why didn't the RTC sue the Gill family to-*

TOM HINDES: I'm not going to-

ROBERT KRULWICH: *-recover money for the taxpayers?* [21]

TOM HINDES: I'm not going to talk about specific cases.

ROBERT KRULWICH: [voice-over] In Washington, Tom Hindes is the RTC's lawyer in charge of recovering money from

S & L wrongdoers. Often, he says, these lawsuits aren't worth pursuing.

TOM HINDES: Directors and officers are not the people with the most resources.

ROBERT KRULWICH: *But they're the guys who did it. They're the ones who did it.*

TOM HINDES: Well, they're not the only ones who did it.

ROBERT KRULWICH: *But they're thethey ran the banks. They made these loans. They lost our money.*[22] We should get it back.

TOM HINDES: *If you stole a million dollars from me and then you spent it and you don't have any moneyI mean, I can sit here and say, "Well, I should get that million dollars back".*[23]

ROBERT KRULWICH: But you're not saying that all those people are impoverished now.

TOM HINDES: I'm not saying all of them are impoverished and where the resources are there to pursue a cost-effective and a valid claim, we pursue those claims.

ROBERT KRULWICH: [voice-over] *Well, were the Gills too poor to sue?* [24] *We checked and discovered that after Gill Savings went broke, Christopher Gill and his wife still owned or were partners in the Butterfield apartments, the Spanish Main apartments, Walnut Grove apartments, Briarbend apartments, all of the Austin–San Antonio area. They also had a vacation home in Beaver Creek, Colorado, a posh ski resort outside of Vail, not to mention another vacation home on the Texas Gulf coast, a 2,000–acre ranch and a residence in the most exclusive part of San Antonio.*[25] *And the memo shows the RTC itself determined that Christopher Gill had at least $3.7 million.*[26] *So they had money.*[27] *So why didn't the RTC sue?*

SHARON HOWARD: *Well, I can't believe it just fell through the cracks, so I have to believe that there was some other kind of pressure brought to bear.*

ROBERT KRULWICH: Attorney Sharon Howard was part of the RTC's money recovery team in Dallas and *she smelled politics.*[28]

SHARON HOWARD: *What makes me think that there may have been some political motivation is the fact that the major complex cases were being retained in Washington and those cases somehow, from the ones that I've seen, particularly from San Antonio, the cases were not pursued.*

ROBERT KRULWICH: *So somebody wanted those cases back in Washington.*

SHARON HOWARD: *Uh-huh.*

ROBERT KRULWICH: *And somebody who got them back in Washington didn't prosecute them.*

SHARON HOWARD: *Right.*[29]

BILL DePUGH: Things are delayed. Things are set aside. *Certain tasks are not done that might lead to certain people.*[30]

ROBERT KRULWICH: [voice-over] Bill DePugh had been a government investigator for more than 30 years. Once chief of criminal investigations for the IRS in Manhattan, he had now become the RTC's head of investigations in Texas and he, too, was suspicious of his own bosses.

BILL DePUGH: They wouldn't give us subpoenas. They wouldn't answer phone calls. They lied to us. I mean, you'veI figured, "What's going on here?"

ROBERT KRULWICH: [voice-over] *Well, one thing wasn't going on. The RTC never issued a single subpoena in its investigation of the Gills.*[31] *The memo shows they did not demand to see the Gills savings accounts or certificates of deposit or stocks or bonds.*[32] And DePugh says this happened in case after case.

BILL DePUGH: *Now, if we have subpoena power and do not use it to follow that money trail and find out where the assets*

*are hidden or where they went or how they got there, we're not doing our job.*[33]

TOM BURNSIDE: I mean, one of the big things that you had to do in Texas was you had to figure out "Where'd the money go?"

ROBERT KRULWICH: [voice-over] Tom Burnside left a good corporate law job in St. Louis and worked side by side with Bill DePugh in Dallas. He, too, says subpoenas are essential to getting money back.

TOM BURNSIDE: *The people that were running these institutions are smart people. They're not going to leave notes in their files saying, "Ha, ha! I took the money and this is where you're going to find it."* [34]

ROBERT KRULWICH: [voice-over] But in Washington, Tom Hindes says subpoenas aren't always necessary.

TOM HINDES: We have ability to determine whether people have assets or not without using subpoenas.

ROBERT KRULWICH: [voice-over] He says that, at first, it was not clear the RTC had been given full subpoena power by Congress, so they decided to use them very sparingly.

[interviewing] *You were going to go out and look around for documents and everybody would just hand them to you. "Here, take my financial statements. Here, look through my bank account. Here, find out all my stocks and bonds. Here, check all the things that I have hidden in my house." No one's going to do that.* [35]

TOM HINDES: Well, it may surprise you to know that there are a lot of people who do that.

Sen. JOHN KERRY, (D), Massachusetts: The results of this lack of subpoena were catastrophic.

ROBERT KRULWICH: [voice-over] Last year, when Senator John Kerry asked about the lack of subpoenas in Texas, the RTC reported back it hadn't issued a single subpoena in about two thirds of its failed S & Ls.

Sen. JOHN KERRY: There's a pattern of avoidance here that raises very serious questions about whether or not there was political influence.

ROBERT KRULWICH: [voice-over] Senator Kerry has taken a particular interest in the Gill case.

Sen. JOHN KERRY: Well, I took an interest in that case because it is one of those cases where you have a very significant loss, but also because there was a criminal investigation.

ROBERT KRULWICH: What happened in the criminal proceeding?

Sen. JOHN KERRY: *In the criminal proceeding, there was some presentation of evidence to a judge.*[36] *He found there was insufficient evidence for a criminal finding and so that was dismissed.* [37]

ROBERT KRULWICH: [voice-over] But Senator Kerry wondered why didn't the RTC simply file a civil suit for money, a much easier standard?

Sen. JOHN KERRY: Oh, a much easier standard. A much easier standard and a clear standard to be able to try to recoup some money.

ROBERT KRULWICH: [voice-over] *But by the time the judge dismissed the Gills' criminal case, the time to sue had run out.* [38]

[on camera] *So no court ever got the chance to decide if the Gills owe the taxpayers money and, as of this moment, except for one settlement with a Gill lawyer, the taxpayers got nothing back in the Gill case.*[39] But our story doesn't end there.

[voice-over] One of the top officers at Gill Savings who, according to the RTC's memo, was involved in varying degrees in the bad loans, just recently got a promotion. His name: John Dalton. He's the guy-on the right, sitting beside two United States Senators from Texas, Kay Bailey Hutchison and Phil Gramm.

Sen. PHIL GRAMM, (R), Texas: [July 13, 1993] I'd like to say that I've known John Dalton for a decade and a half. He has been my friend. He has been an outstanding businessman.

ROBERT KRULWICH: [voice-over] Who is John Dalton? His resume says that from 1981 to 1984, he was president of the Gill Company's real estate division. That's part of Gill Savings. He'd also been national treasurer of Jimmy Carter's presidential campaign, a top S & L regulator and a businessman. But his resume did not clearly state that after leaving the Gills, he ran a savings and loan here called Seguin Savings.

John Dalton ran it and it went broke and cost the taxpayers $100 million.

Sen. DAVID PRYOR (D–AR): John Dalton is a true leader.

Sen. JOHN McCAIN, (R), Arizona: I find him to be eminently qualified.

Sen. PHIL GRAMM (R–TX): As we say in my part of the country, he is a top hand and I think he will do an outstanding job and I'm proud to support him.

ROBERT KRULWICH: [voice-over] Five years after his S & L collapse, John Dalton was nominated by President Clinton to be Secretary of the United States Navy.

Linda Alvarez remembers John Dalton. In 1988, she was a federal bank examiner who reviewed the books at Dalton's S & L.

[interviewing] What was the problem there?

LINDA ALVAREZ: Lending. Excessive growth, unsafe and unsound practices.

ROBERT KRULWICH: Reckless loans.

LINDA ALVAREZ: Yes.

ROBERT KRULWICH: [voice-over] Alvarez says she told Dalton she was going to shut him down, but he objected and said he would place an immediate phone call to his friend, George Bush.

[interviewing] And you say?

LINDA ALVAREZ: "Fine." I mean, "That is your prerogative to call in whoever you you want to call."

ROBERT KRULWICH: He's the vice president, or maybe the president—I don't remember—of the United States.

LINDA ALVAREZ: If somebody tells me that they wanted to call God, that would be their prerogative. I mean, it does not influence what my decision would be.

ROBERT KRULWICH: [voice-over] Alvarez says despite Dalton's threat, she shut Seguin down. She says in Texas, S & L executives always had friends in high places.

Sen. KAY BAILEY HUTCHISON, (R), Texas: I think there is no question of his qualifications for this high office and I do not think the president could have made a better choice.

ROBERT KRULWICH: [voice-over] John Dalton declined to be interviewed for this broadcast.

Sen. SAM NUNN (R–GA): Mr. Dalton, we're going to have to get you to stay around a few minutes for an executive session.

ROBERT KRULWICH: [voice-over] Dalton's S & L problems were not disclosed to the public. Instead, members of the Armed Forces Committee went into a private room and discussed Seguin in executive session.

The full Senate voted unanimously for John Dalton unaware that he and other officers at his S & L had its insurance company pay $3.8 million in a legal settlement, unaware that in it, the government had asserted that they'd been "grossly negligent" at Seguin Savings and unaware that two of his partners who controlled Seguin, David Sacks and Doyle Spruill, were later convicted of bank fraud at another S & L and sent to jail.

JUDGE: [July 22, 1993] Raise your right hand and repeat after me.

ROBERT KRULWICH: What do the American taxpayers have to show for the work that you and your colleagues did?

BILL DePUGH: Oh, probably minimal of what the results could have been. As a taxpayer, I figure I got screwed. Again.

FORREST SAWYER: Three of the RTC employees who appeared in this report have resigned in frustration and Navy Secretary John Dalton says he did nothing wrong.

As for the RTC, officials there say, as far as the S & L clean-up was concerned, politics played no part. Congress did give the RTC six years to act. That six years is up at the end of this year.

[Commercial break]

. . . .

## APPENDIX 2

ROBERT KRULWICH: And on the paranoid side, do you have any sense that Texas judges, Texas legislators, Texas Washington figures, Texas presidents, Texas treasury secretaries, Texas chairmen of important committees, Texans, Texans, Texans, organized this so that you couldn't collect money from them and their friends? [to Tom Hindes] [1]

ROBERT KRULWICH: Are Texans greedier than other human beings? [to Linda Alvarez] [2]

ROBERT KRULWICH: But I'll help you with all these things . . . by being professionally disingenuous. Accountably is another, I guess I wonder, like, if you didn't do a good job or if you did a great job, the Texas gang is just everywhere. They're in the courts, they're in the congress, they just take care of this, it seems. [to Sharon Howard] [3]

ROBERT KRULWICH: While you were running, helping run this Texas hunt for bad guys and money, how come there were 86 savings and loans in the state of Texas that would no subpoenas were issued, none? [to Sharon Howard] [4]

ROBERT KRULWICH: Aren't you surprised by the coalition of Texans everywhere? It's, after all, it's Texas judges that have held you to the strictness standards of proof. It's Texas politicians who have tended to protect their friends. It is the Texas delegation when it gets into these conference committees, that says no extensions. Isn't Texas just helping itself to eight hundred billion dollars of whatever this sum of money is, and it's telling the rest of the country, you paid, we keep it, go away. [to Sharon Howard] [5]

ROBERT KRULWICH: It is the senior senator from Texas who opposes, and who manages in conference, to water it down. When the Congressional Delegation is looking around for, I guess it's now on 2 or 3 occasions, for ways to sort of soften the expiration thing it always seems to be Texans in the lead. [to Linda Alvarez] [6]

ROBERT KRULWICH: But somehow the rules for savings and loan executives in this state were, you were allowed to feed at the trough a little bigger meal than other states do. [to Linda Alvarez] [7]

ROBERT KRULWICH: And do Texans who now get into the savings and loan business get into it very carefully with the most conservative aspirations and they keep their greed tucked way, way deep in their pocket? [to Linda Alvarez] [8]

ROBERT KRULWICH: So, if this was a Hollywood movie, then that would be like the scene where—then you—and the next scene would be a bald guy with a gold tooth and, like, the pinkie rings would show up. [to Linda Alvarez] [9]

ROBERT KRULWICH: There's something consistently peculiar about the State of Texas as opposed to others. Is it both in the way the laws are structured and the politics and so on. [to Tom Hindes] [10]

ROBERT KRULWICH: Does this surprise you at all that he'd pluck out George Bush? After all, this is a man who is running the Mondale, Carter/Mondale

campaign. I'm just curious, do people just go for the biggest name cause it's the state that just does that sort of thing? Or is there a surprise in that? [to Art Leiser] [11]

ROBERT KRULWICH: What about Texas' distinct role in all of this? [to Don Woods] [12]

ROBERT KRULWICH: Are Texas politicians a little more apt to try to protect their businessmen? [to Don Woods] [13]

ROBERT KRULWICH: If I had negligently, somehow or another, taken my depositors money and taken say $10,000,000 of money and spends it on a sail boat which sank, drinks which I drank, vacation which I took, and I have $10,000 left. [to Sharon Howard] [14]

ROBERT KRULWICH: Suppose I took some of my depositors' money at my savings and loan, and I spent a whole lot of it on me, and a hunk of it is still on my house. My very beautiful house, which has a swimming pool, playroom media center, and a whole lot of extras. A many million dollar house and that's all I have. [to Sharon Howard] [15]

GLENN SILBER: One last question—a term that we haven't used today, "looting". Let her explain that, when they know they're going down, sometimes there's a pattern that occurs. ROBERT KRULWICH: When you inform someone that they're insolvent ... GLENN SILBER: Not so much you inform. They know themselves. They're making reports. ROBERT KRULWICH: What does looting mean? [to Linda Alvarez] [16]

ROBERT KRULWICH: The Gill case, for example, where there's this whole family and off they go, you know, life goes right on. And yet you can attach to some of these people rather large sums of money which are either still missing or you, even in some of these things, you even know exactly where the money is. [to Linda Alvarez] [17]

ROBERT KRULWICH: But I'll help you with all these things ... by being professionally disingenuous....I wonder, like, if you didn't do a good job or if you did a great job, the Texas gang is just everywhere. They're in the courts, they're in the congress, they just take care of this, it seems. [to Sharon Howard] [18]

ROBERT KRULWICH: Have you heard that paralegals have now reported that they have been ordered by others to put files, to put phoney subpoenas in the files? ... GLENN SILBER: There's a word for that.... SHARON HOWARD: It's called fraud. GLENN SILBER: Or cover-up. ROBERT KRULWICH: That's true. GLENN SILBER: It's better for her to choose her own words, okay? Maybe you should suggest it because I suggested it to you. ROBERT KRULWICH: Isn't there a word to describe this kind of conduct? GLENN SILBER: I—I'm sorry. I stupidly opened my mouth. So now you have to say it, cause I can't be coaching her to say it. You have to suggest what that word is, and let her react to that.... ROBERT KRULWICH: So let me back up. So, you have no notion, then, why this guy just may be doing some sort of private act of, of, what—I don't know. Contrition? SHARON HOWARD: I doubt that contrition is the word, but maybe cover-up. Papering the file. ROBERT KRULWICH: Isn't cover-up the right word to describe this kind of conduct? [to Sharon Howard] [19]

GLENN SILBER: Uh, Robert, can you pose a question about the people who caused these losses, got rich, and are still having a great time, having stashed money wherever? I'd like to know how he feels about it, about criminals going free, as a result of all this. ROBERT KRULWICH: And for those people who are able to take the money and run, whom you were not allowed to catch up with, where does that leave you thinking about them and about you? [to Tom Burnside] [20]

GLENN SILBER: One last question—a term that we haven't used today, "looting".

Let her explain that, when they know they're going down, sometimes there's a pattern that occurs. ROBERT KRULWICH: When you inform someone that they're insolvent ... GLENN SILBER: Not so much you inform. They know themselves. They're making reports. ROBERT KRULWICH: What does looting mean? [to Linda Alvarez] [21]

ROBERT KRULWICH: Or let me try to put it in your mouth and you can agree with me or not, that way it takes the onus off you. [to Cathie Buxie] [22]

GLENN SILBER: Shock. ROBERT KRULWICH: Were you shocked? [to Cathie Buxie] [23]

ROBERT KRULWICH: Most savings and loans are political animals. And in the bigger ones they do have political fixes. I mean, John Dalton is a kind of political guy and the Gills probably hired him for awhile to be their political handler and to make calls to politicians, that's my guess. So when Dalton tells you that he's got political friends, he does. That's his job, to have political friends. So the Gills and he as a team are somewhat of a force, arguably they're big, they have a big bank and they're doing all this stuff and they have him and he has the Rolodex. But what we don't know, and I guess you don't know either, is how he might have used that Rolodex, if he did. It's just he keeps getting these great jobs. [to Linda Alvarez] [24]

ROBERT KRULWICH: In a place like San Antonio there was a lot of mischief going on, and yet in the town of San Antonio, that area, there have been no criminal prosecutions. The Gill family is a big family there and they have arguably lost an awful lot of money that the taxpayers might recover and there are other such things, other such organizations and families in that area and there's nothing happening there. [to Linda Alvarez] [25]

ROBERT KRULWICH: I'll try one more time just to walk around the politics of this because I'm just wondering if you could search your memory for any. We sense as I guess you do that there's this, some sort of vague, good old boy network arrangement here. [to Linda Alvarez] [26]

ROBERT KRULWICH: Well, going back to the early 90's. Let me just do that. And I presume, conclude, from this that you had no doubts that you could go ahead without subpoenas and find bad guys at University Savings, where two point four billion dollars disappeared—no subpoenas. Bright Banc Savings, one point five billion dollars disappears—no subpoenas. Gill Savings, one point four billion—no subpoenas. [to Tom Hindes] [27]

ROBERT KRULWICH: But the question is in Gill for example, if it is $1.4 billion that the taxpayers had to pay and you issue no subpoenas isn't it a fair conclusion for the taxpayers to say, "Well, they didn't try or they think that the Gill family is completely impoverished." Which is the case—you didn't try or you didn't think the Gill family had any money? [to Tom Hindes] [28]

ROBERT KRULWICH: And isn't that sending a signal to the group of people who may have stolen money? [to Tom Hindes] [29]

ROBERT KRULWICH: Well, I will cite you ... you don't want to talk about specific example, Gill, did you, but there are directors and officers at that bank that remain untouched. [to Tom Hindes] [30]

ROBERT KRULWICH: We have uncovered, just from looking around, in that family say, three billion dollars or four billion dollars or five—sorry, three million dollars, four million dollars in just real estate assets just sitting there, to be no big problem. They couldn't have been too poor. [to Tom Hindes] [31]

ROBERT KRULWICH: I have beaten you over the head with this so I ... Let me ask some other questions. Um, these are ones that I am going to have to ask you because of our work. But, you say whatever you want to say. Um, why

didn't the RTC sue the Gill family to recover money from the taxpayers? [to Tom Hindes] [32]

ROBERT KRULWICH: Senator Kerry said, again at the same, on the same occasion, this is not to any specific case, but he thinks, I will quote him, in the Gill case and in the others, the RTC took a dive and here's his phrase, "because important people in Texas did not want to be sued or did not want their friends to be sued. And they had the political clout with the RTC to make sure that outcome was achieved." [to Tom Hindes] [33]

ROBERT KRULWICH: And on the paranoid side, do you have any sense that Texas judges, Texas legislators, Texas Washington figures, Texas presidents, Texas treasury secretaries, Texas chairmen of important committees, Texans, Texans, Texans, organized this so that you couldn't collect money from them and their friends? [to Tom Hindes] [34]

ROBERT KRULWICH: I wonder whether these guys who are sitting in the Federal Bench in Texas or the Federal Bench in Virginia, I wonder whether they aren't touched somehow by their golf club conversations. [to Tom Hindes] [35]

ROBERT KRULWICH: The Gill case, the Gill Savings is an institution that lost $1.4 billion, you took an interest in that particular investigation, what did you find? [to Sen. Kerry] [36]

ROBERT KRULWICH: Would it be interesting to you to see the thing that doesn't exist? Here is an Authority to Sue Memorandum on the Gill case, dated and signed by pretty much everybody in the RTC.... Now how does that make you feel. ABC can find it and the United States Senate can't? [to Sen. Kerry] [37]

ROBERT KRULWICH: Would it surprise you sitting where you San Antonio, Texas there was not a single subpoena inquiry made of the Gill family? Of any of the Gill interests? Of the Gill bank? [to Sharon Howard] [38]

ROBERT KRULWICH: Well, going back to the early 90's. Let me just do that. And I presume, conclude, from this that you had no doubts that you could go ahead without subpoenas and find bad guys at University Savings, where two point four billion dollars disappeared—no subpoenas. Bright Banc Savings, one point five billion dollars disappears—no subpoenas. Gill Savings, one point four billion—no subpoenas. [to Tom Hindes] [39]

ROBERT KRULWICH: But the question is in Gill for example, if it is $1.4 billion that the taxpayers had to pay and you issue no subpoenas isn't it a fair conclusion for the taxpayers to say, "Well, they didn't try or they think that the Gill family is completely impoverished." Which is the case—you didn't try or you didn't think the Gill family had any money? [to Tom Hindes] [40]

ROBERT KRULWICH: San Antonio had about, I think she had a number of cases that she thought should have resulted in some kind of prosecution. And the fact that none of them did, and that, that there were no subpoenas there and that there, that's puzzling to me that it's so uniform.... Which would mean maybe Cisneros, or maybe Gonzalez, or maybe somebody in the .... [to Tom Burnside] [41]

ROBERT KRULWICH: Ninety, a hundred, two hundred, three hundred, one billion, bonuses of a million dollars a year as it begins to fail. Fine with me says the examiner, fine with me says the examiner. You've got to wonder. [to Linda Alvarez] [42]

ROBERT KRULWICH: In the Gill case they were giving bonuses, very, very large bonuses, so they would get like million dollar bonuses, in years in which the performances of the institution was terrible. Is that a warning sign? [to Linda Alvarez] [43]

ROBERT KRULWICH: And if it turns out that the board of directors has one person designated to decide on bonuses,

and that one person owes his job to the Gills in that case, so the Gills hire the person to pay them, is that ok? [to Linda Alvarez] [44]

ROBERT KRULWICH: So you've got the secret that you're lending to yourself, you're lending too much to yourself, and you're being paid by yourself for being the genius that decided to lend to yourself [to Linda Alvarez] [45]

ROBERT KRULWICH: The Gills paid themselves a million dollars. Is that a little or a lot as things were going at the time? ROBERT KRULWICH: But they got it. GLENN SILBER: And they kept it. ROBERT KRULWICH: Well, we don't know! [To Linda Alvarez] [46]

GLENN SILBER: There is something that Don told me. They had one subsidiary that helped the mom. Could you mention that briefly? Just help me explain. [to Don Woods] [47]

ROBERT KRULWICH: Is it unusual for a savings and loan to have a subsidiary that pays your Mom's utility bills? ... Can you explain this, what they had there going there with the Mother. It was a company designed to pay her bill? [to Art Leiser] [48]

ROBERT KRULWICH: Now, they had a Mom who, somewhat embarrassingly, they had set up a whole subchapter company to pay her electric bills or something. [to Cathie Buxie] [49]

ROBERT KRULWICH: Now, we've come across one that simply took care of mom.... We found one subsidiary that just paid basically the mom's bills, mama Gill's bills. [to Don Woods] [50]

ROBERT KRULWICH: Would you be terribly surprised if I told you that the Gills are big supporters of Henry Gonzalez? [to Sharon Howard] [51]

ROBERT KRULWICH: Fifty boxes of material from that bank were supposed to be sent, from that thrift, were supposed to be sent from San Antonio to Washington and they got lost. In your experience, have you ever heard of large numbers of boxes being lost in transit? [to Tom Burnside] [52]

ROBERT KRULWICH: Another phenomenon that we connected with Gill is that the Gills would sometimes be the people to whom the Gill Savings and loan was lending to.... Did you, in the real estate section, know that this was the Gills lending to the Gills? The second group being, covering up their identity? [to Don Woods] [53]

ROBERT KRULWICH: We ran into a deal called Bee Caves which is one of their projects, and in the first round of that project, in the first half of that transaction they didn't actually have an appraisal. [to Art Leiser] [54]

ROBERT KRULWICH: It was probably Bee Caves in which another family, another institution involved with the same family does what seems to be an arms length deal with Gill and it turns out that in the middle money is changing hands between family members. [to Cathie Buxie] [55]

ROBERT KRULWICH: Well, Bee Caves was a raw land deal, $15 million, that's a big loan. [to Cathie Buxie] [56]